[Civ. No. 4217.   Fourth Dist.   July 31, 1951.]

ELIZABETH A. BLOCK et al., Appellants, v. A. C. SNYDER et al., Respondents.

Garfield & Garfield and Fenton Garfield for Appellants.

Gray, Cary, Ames & Driscoll, Ward W. Waddell, Jr., Henry Pitts Mack, McInnis & Hamilton and John W. McInnis for Respondents.

GRIFFIN, J.—Plaintiffs, husband and wife, sought to recover damages from defendants for injuries suffered by plaintiff Elizabeth A. Block (hereinafter referred to as plaintiff) resulting from her falling down a stairway in an office building owned by defendants A. C. Snyder, Henry A. Wuest, and Harry W. Snyder, individually and as a copartnership doing business as the Broadway Building Company (hereinafter referred to as the Company). The stairway led to and was a portion of the premises leased by defendants Armando J. Cendali, Amos Cendali, Sr., Amos Cendali, Jr., and Joseph Tricola, individually and as a copartnership doing business as Benny's Spaghetti (hereinafter referred to as Benny's Spaghetti Company).

Plaintiffs alleged that the building was negligently constructed and maintained by the defendants in that the stairway here involved appeared to plaintiff to open into the lobby, but actually it opened directly into a steep and unlighted stairway; that she mistakenly entered this doorway believing it opened into the lobby and she fell down the stairway, fracturing her spine and receiving other serious injuries. Defendants answered, denied negligence, and set up the affirmative defenses of unavoidable accident and contributory negligence. On the issues thus framed the case was tried by a jury and resulted in a judgment for defendants.

The building was located on the east side of First Street between Broadway and C Streets. It was originally built in 1912-1913 and purchased by defendant Broadway Building Company early in 1944, which company sold it in 1948. The basement, including the stairway, was leased to defendant Benny's Spaghetti Company, the partnership herein referred

to, in February, 1944. The double glass door entrance to the building is separated from the double glass door basement entrance by a permanent glass window somewhat similar in design. A sign reading "Broadway Building" is over the entrance to the office building and a sign reading "Benny's Spaghetti," with an arrow pointing downward, is over the other double door entrance. In addition, there is an overhead neon sign running perpendicular to that entrance reading: "Benny's" with an arrow pointing to the same entrance. In the photograph (Defendant's Exhibit A) in evidence, appears a cardboard sign stuck on the north half of the double door entering to the basement about midcenter reading: "Open— Mon. thru Fri.—4 p.m. to 12 p.m. . . ."

There is a conflict in the evidence as to whether this sign was so placed on December 8, 1947, the day of the accident. The north half of the double door was fastened shut on that day. To open the south half of the door, which was level with the sidewalk, it was necessary to press a latch and pull the door out toward the sidewalk entrance. Neither door swung inward, as distinguished from the doors entering the building lobby. The first step of the marble stairway was on a level with the sidewalk and extended from the doors eastward and in toward the stairway, approximately 10 to 12 inches, and thereafter steps followed to the basement. There were handrails on each side of the stairway, which was 52 inches wide.

About 1:30 p.m. on the day in question plaintiff, according to her testimony, proceeded northerly on the sidewalk for the purpose of entering the Broadway Building and purchasing Christmas cards in one of the offices upstairs. Instead of entering at the main lobby entrance, she decided she would take a "short cut" through this other entrance and save time due to the inclement weather. She testified that she pulled at the stationary door and found it would not open; that she then unlatched the other door, pulled it toward her, stepped into the passageway, which proved to be a stairway, and that she fell; that she had on dark glasses; that the hallway appeared to be dark and unlighted but she believed she was entering a passageway into the main lobby of the building. At the foot of the stairs the proprietor of the spaghetti establishment saw her, found her dark glasses on the stairway, and aided her in obtaining an ambulance. She testified that she was positive she did not slip on anything.

According to the proprietor's testimony, plaintiff said she was trying to get into the Broadway Building; that she had

mistaken the door and had entered with dark glasses on; that she said "I shouldn't have worn them into the building." He then testified that there was a large single door at the head of the stairway at the time he leased the premises and that, with the consent of the owners of the building, he changed the single door, which opened only outwardly, to a double door that operated in the same manner; that these doors were left open in warm weather and closed on cold days; that the drugstore above had a kitchen in the basement which was used by it and which was taken over by him; that the premises also were previously occupied by a locker club and for storage purposes.

The main question involved on this appeal is whether the court erred in refusing to give an instruction offered by plaintiffs reading: "You are instructed that the San Diego City Building Ordinance effective at the time of this accident provided that: 'doors shall not open immediately upon a flight of stairs but on a landing at least equal to the width of the door.' If you find from the evidence that the defendants, or any of them, conducted themselves in violation of said Ordinance just read, you are instructed that said conduct constituted negligence as a matter of law." This instruction is predicated upon a certain city building ordinance, No. 8852, adopted in 1922, incorporated in San Diego building code ordinance No. 13375, adopted in 1932, which was admitted in evidence against defendant building company, and later, on motion, was stricken.

Section 3304 does provide that "Doors shall not open immediately on a flight of stairs but on a landing at least equal to the width of the door."

It is defendant company's position that such ordinance was not admissible against it and that such an instruction was not applicable to it for the reasons (1) that the building was erected in 1912, before the ordinance was adopted; and (2) that since the building company did not acquire the premises until 1944, and as owner, made no changes in its structure, none of the provisions of the ordinance were violated by it, and accordingly neither the ordinance nor the instruction was applicable to it. Defendant Benny's Spaghetti Company maintains that as to the entrance to the Broadway Building it, as lessee, was under no legal obligation or duty to change or alter the entrance to the building since it belonged to its landlord and was under the landlord's exclusive control; that the sole change involving the restaurant was the change of the

door from a single panel door to two panels, and nothing further; that the overall size of the door, the manner in which it was opened, the landing and stairs, were in no way materially changed by the lessee nor by the lessor from the time of the inception of the building up to the time of the accident, and that therefore the ordinance in no manner affected the rights of these particular lessee defendants; that if there was any question about these defendants being liable under any theory of general negligence, other than a violation of the ordinance, that question was disposed of by the jury's verdict.

. We must therefore examine the provisions of the building code to determine whether or not it was applicable to either group of defendants, insofar as it related to the proffered instruction refused. (This is the only claimed violation upon which plaintiffs rely.)

So far as the record is concerned, the building originally was constructed in accordance with all existing ordinances. The adoption of the new ordinance, by its terms (§ 104) recites that it applies to existing buildings under the following conditions: "104 . . . (a) Major Alteration and Repairs: If alterations and/or repairs in excess of fifty (50) per cent of the value of an existing building are made to such existing building within any period of twelve months, the entire building shall be made to conform with the requirements given herein for new buildings; . . . ." Subdivision "(b) Changed Use: If the existing use or occupancy of an existing building is changed to a use or occupancy which would not be permitted in a similar building hereafter erected, the entire building shall be made to conform with the requirements given herein for new buildings; provided, however, that if the use or occupancy of only a portion or portions of an existing building is changed and such portion or portions are segregated as specified in Section 503 of this Code, then only such portion or portions of the building need be made to comply with said requirements; and provided, further, that the Building Inspector is hereby given authority to approve any change in the use or occupancy of any existing building within any one Group of Occupancy as specified in Part III, even though such building is not made to fully conform to the requirements of this Code, when it is obvious that such a change in the use or occupancy of the existing building will not extend or increase any existing non-conformity or hazard of the building."

Subdivision "(c) Additions. Any existing building not covered by the preceding paragraphs (a) and (b) which has

its floor area or its number of stories increased or its use or occupancy changed in any way from its former or existing use or occupancy shall be provided with stairways, emergency exits and fire protection facilities as specified in this Code for buildings hereafter erected for similar uses or occupancies.''

Subdivision ''(d) Minor alterations and repair. Every alteration or repair to any structural part or portion of an existing building shall when deemed necessary in the opinion of the Building Inspector be made to conform to the requirements of this Code for new buildings.''

Section 502 provides: ''Change in Use. No change shall be made in the character of occupancy or use of any building which would place the building in a different Group of Occupancy, unless such building is made to comply with the requirements of this Code for that Group.

''EXCEPTIONS: . . . Buildings in existence at the time of the passage of this Code, may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the passage of this Code, provided such continued use is not dangerous to life.''

Sec. 503, above mentioned, provides: ''(a) When the occupancy of a building is such that different portions of the building are placed in different occupancy Groups, a 'Fire Separation' as specified in this Section shall be provided so that each Group is entirely segregated. . . .''

Subdivision (a) of section 104 is clearly not applicable as the claimed alteration could not be considered a major alteration. The first portion of subdivision (b) applies only to the use and occupancy of an existing *building*. As to the use and occupancy of a portion of the building before the latter paragraph could be applicable, it must be shown that such portion or portions were segregated as specified in section 503 relating to ''Fire Separation''; that different portions of the building were placed in different ''Occupancy Groups''; and even then the building inspector may approve any such change within one ''Group of Occupancy,'' even though such building is not made to fully conform to the code, when it is obvious that such a change in the use and occupancy of the existing building would not extend or increase any ''existing'' nonconformity or hazard of the building. ■ In the absence of any evidence indicating the ''Group of Occupancy'' allowable, and that the change indicated lacked the approval of the building inspector, it cannot be said, as a matter of law,

that defendants violated this provision of the building code. Subdivision (c) applies to *buildings* which have their floor area or their number of stories increased or the buildings' use or occupation changed, and clearly does not apply to minor alterations. ■ Subdivision (d) covers minor alterations to the structural part or portion of the *building when in the opinion of the building inspector* it is deemed necessary. There being no evidence of such necessity, it cannot be said, as a matter of law, that defendants violated this section.

The record does not show that there was any such requirement as set forth in section 3304 when the building was constructed. Apparently the stairway, at that time, had a large door at the head of it and in the same position as the double doors which replaced it. If this change had not occurred, that section would not be retroactive in this respect. ■ The change made, in effect, caused no more hazardous condition than the previous method of entrance, and since there was no sufficient showing that defendants were brought within the provisions of the building code by virtue of the claimed change or claimed change of occupancy, it cannot be said that either group of defendants was guilty of negligence as a matter of law in this respect.

There was testimony by an architect, produced by plaintiff, that the stairway, as it existed at the time of the accident, did not conform with standard and accepted construction and architectural practice because of the lack of a landing between the door and the first riser. This, of course, bore on the question of general negligence as pleaded by plaintiff and on which issue the jury found in favor of defendants. It did not bear on the question presented by the refused instruction.

Since the only contention made by plaintiff is that it was prejudicial error for the trial court to refuse to give that particular instruction, we will not consider any other likely ground on which the ordinance might have been admissible against these defendants.

■ Another ground urged for a reversal of the judgment involves an oral instruction given after the jury returned seeking a clarification of the written instructions that had been given on the subject of negligence and contributory negligence.

The trial judge who instructed the jury in the first instance was not then present by reason of illness. Another judge was called in and it was stipulated by the parties that he might

take the verdict or "give further instructions in case they request same." On the return of the jury, that judge remarked to it:

"I am informed that the jury requests some additional instructions or clarification of the instructions. THE FOREMAN: Yes, your Honor. Some of them are confused on the question of negligence and contributory negligence, and they would like to have those instructions read again. THE COURT: Well, it is with reference to what constitutes negligence, what constitutes contributory negligence, as to the effect of it? Is that generally what you have in mind? THE FOREMAN: I think that is what we had in mind, yes, sir. THE COURT: Well, let's sort of discuss it a minute and see if we can clear it up any for you."

Then, without rereading the proper written instructions given on the subject and about which plaintiff makes no complaint, the judge orally attempted, in a four-page dissertation, to discuss what the law was in this respect, and started out by saying:

"Generally speaking, when we use the term 'negligence' in an action of this character, what is meant is the failure to use the degree of care which the law requires under that particular state of facts."

He then gave a fairly clear definition of negligence. In discussing contributory negligence he told the jury it was not permitted to weigh the negligence of the different parties, i.e., who was most negligent. Then followed a fair oral treatise on the subject of contributory negligence in which the trial judge stated:

"As to contributory negligence, every person is required by law to use ordinary care for his own safety and protection. . . ."

He then, inadvertently, no doubt, said:

"If, however, he has failed to use that degree of care and has been negligent, and that negligence has contributed to the injury in any degree, however slight, then it furnishes a complete defense," erroneously omitting the statement that such contributory negligence must contribute as a "proximate cause" to the accident and injury to defeat recovery. This same omission appears in two or three other places in the instruction. In support of the claim that this omission constitutes prejudicial error plaintiff cites such cases as *Fernandes* v. *Sacramento City Ry. Co.*, 52 Cal. 45; *Rush* v. *Lagomarsino*, 196 Cal. 308 [237 P. 1066]; *LaRue* v. *Powell*, 5 Cal.App.2d 439 [42 P.2d

1063] ; *Broun* v. *Blair,* 26 Cal.App.2d 613 [80 P.2d 95] ; and *Spear* v. *Leuenberger,* 44 Cal.App.2d 236 [112 P.2d 43].

Defendants cite several cases to the effect that where a formula instruction is given, containing all of the essential elements of negligence and contributory negligence, an additional instruction given on the subject which omits one element is not necessarily prejudicially erroneous where the court points out to the jury, as was originally done in this case, that it was not to single out any one instruction, but that it was to give consideration to all of the instructions in the case and to consider them together. See *Briscoe* v. *Pacific Electric Ry. Co.,* 89 Cal.App.2d 439 [200 P.2d 875] ; *Weaver* v. *Carter,* 28 Cal.App. 241, 247 [152 P. 323] ; and *Fox* v. *Ravera,* 122 Cal.App. 35 [9 P.2d 590], where the instruction failed to include the word "proximate" in a statement of the conditions necessary to recover. There the court said at page 39 :

"Appellant's criticism of this particular instruction is technically sound, but before the giving of an instruction justifies a reversal, it must appear that it prejudicially affected the rights of the complaining party." (Citing cases.)

There is no doubt that the jury, in the first instance, was fully instructed on the necessity of proving that any contributory negligence of plaintiff must contribute proximately to the cause of her injury in order to defeat her claim. The trial judge, before the trial, in discussing the pleadings as an outline of the issues presented, so stated, and later instructed the jury in at least five other instructions to this same effect. He then included within those instructions a definition of "proximate cause."

Counsel for plaintiffs concede familiarity with this line of cases but argue that since the foreman of the jury indicated that some of the jurors were "confused" on the question of negligence and contributory negligence, and accordingly requested that the written instructions given on the two subjects be *reread,* it was prejudicial error for the trial judge to give an erroneous oral instruction of his own rather than reread the proper witten instruction as given.

There is considerable merit to this argument and the error mentioned might well have been avoided by so doing. The question before us which is a close one, is whether such error was prejudicially erroneous and would necessitate a reversal of the judgment.

It does appear that the jury was told many times about the necessity of establishing the fact that before plaintiff could

be charged with contributory negligence barring a recovery, it must be shown to its satisfaction that such negligence contributed proximately to the cause of her injury. It does not appear to us that the jury could very well forget or be confused about the necessity of proving this element. In fact, just before the jury retired and immediately before giving the final instructions involving the forms of verdicts and damages, if any, to be assessed, the trial judge again told the jury:

"The issues, then, Members of the jury, to be determined by you in this case are these:

"First: Were the defendants negligent?

"If you answer that question in the negative, you will return a verdict for the defendants. If you answer it in the affirmative, you have a second issue to determine, namely:

"Was that negligence a proximate cause of any injury to the plaintiff, Elizabeth A. Block?

"If you answer that question in the negative, plaintiffs are not entitled to recover; but if you answer it in the affirmative, you then must find on a third question:

"Was the plaintiff, Elizabeth A. Block, negligent?

"If you find that she was not, after having found in plaintiff Elizabeth A. Block's favor on the other two issues, you then must fix the amount of plaintiffs' damages and return a verdict in their favor.

"If you find that plaintiff Elizabeth A. Block was negligent, you then must determine a fourth issue, namely:

"Did that negligence contribute in any degree as a *proximate cause* of the accident?

"If you find that it did, your verdict must be for the defendants; but if you find that it did not, and you previously have found that it was negligence on defendants' part, or some of them, which proximately caused plaintiff Elizabeth A. Block's injury, you then must fix the amount of plaintiffs' damages and return a verdict in their favor."

It is difficult for us to hold that all of the written instructions given to the jury were forgotten by it, and the "omission" to restate to the jury the element of "proximate cause" in the oral instruction resulted in a miscarriage of justice or that a different judgment would have resulted if that term had been therein expressed.

In *Weaver* v. *Carter*, 28 Cal.App. 241, 247 [152 P. 323], it is said:

"... if all the instructions, taken together, and *not being inconsistent with each other or confusing,* give to the jury

a fair and just notion of the law upon the point to which they are addressed, it is sufficient."

The distinction between this line of cases and cases where a *conflict* in instructions constitutes reversible error, is pointed out in *Parkin* v. *Grayson-Owen Co.*, 157 Cal. 41, 49 [106 P. 210]; and *Rathbun* v. *White,* 157 Cal. 248, 253 [107 P. 309].

Since there was ample evidence indicating contributory negligence on the part of plaintiff which, if true, would have been a proximate cause of her injury, we conclude that section 4½ of article VI of the Constitution is applicable and the judgment should be affirmed. (*Briscoe* v. *Pacific Electric Ry. Co.,* 89 Cal.App.2d 439 [200 P.2d 875]; *Briggs* v. *Jess Mead, Inc.,* 93 Cal.App. 666 [270 P. 263]; *Wirthman* v. *Isenstein,* 182 Cal. 108 [187 P. 12]; *Mahoney* v. *Murray,* 140 Cal.App. 206 [35 P.2d 612]; *Jackson* v. *Lactein Co.,* 209 Cal. 520 [288 P. 781]; *Bee* v. *Tungstar Corp.,* 65 Cal.App.2d 729 [151 P.2d 537].)

The trial court reviewed this same question on the motion for new trial and made a similar conclusion. That fact should be considered by this court. (*Nance* v. *Fresno City Lines, Inc.,* 44 Cal.App.2d 868 [113 P.2d 244]; *Olinger* v. *Pacific Greyhound Lines,* 7 Cal.App.2d 484 [46 P.2d 774].)

Lastly, the plaintiffs contend that the court erred in giving defendant Benny's Spaghetti Company's instruction, as follows:

"As to the entrance and premises of the Broadway Building which was under control of the landlord and defendant Broadway Building Company, you are instructed that there was no duty at the time of the happening of this accident upon the defendant Benny's Spaghetti Restaurant to alter, change or modify in any manner whatsoever the entranceway or doors to the Broadway Building Company. This is for the legal reason that they did not control that portion of the building.

"If you find that the stairway here in consideration and the entrance thereto were so constructed as to constitute a nuisance to the general public and that condition was present at the time of the leasing of the Broadway Building Company to Benny's Spaghetti Restaurant, then I instruct you that the defendant Benny's Spaghetti Restaurant is not legally liable for such condition to an invitee of the Broadway Building Company."

This instruction followed the giving of several other instructions predicated upon the relationship of landlord and

tenant and their respective duties to licensees and invitees. It is plaintiff's argument that the instruction is confusing because it cannot be determined what was meant by the words: "As to the entrance and premises of the Broadway Building which was under control of the landlord and defendant Broadway Building Company." It is also charged that it may have confused the jury and led it to believe that it was being instructed that Benny's Spaghetti Company had no duty to repair a defective, hazardous and negligent condition of the doorway in question in this case. It is further contended that the second portion of the instruction is erroneous because it directs a verdict in favor of Benny's Spaghetti Company and states that that company was not responsible to invitees of the Broadway Building Company; and that it was a factual question to be drawn from all the circumstances as to whether or not plaintiff was an invitee of all defendants to enter the particular doorway in question, citing 19 California Jurisprudence, section 55, page 621; *Grant* v. *Sunset Telephone etc. Co.,* 7 Cal.App. 267 [94 P. 368]; and *Stewart* v. *Lido Café,* 13 Cal.App.2d 46 [56 P.2d 553].

When the court instructed the jury in the challenged instruction that the entrance to the premises of the "Broadway Building" was under the control of the landlord, it was stating to the jury the admitted facts in evidence, as to which there is no dispute. Defendant Benny's Spaghetti Company was entitled to have the jury instructed as to that defendant, that there was no legal obligation to alter or change the entrance to the *Broadway Building,* which was at all times under the exclusive control of the landlord. Plaintiff therefore cannot take issue with that portion of the instruction which states that Benny's Spaghetti was not in the control of the Broadway Building entrance. The instruction did not advise the jury that there was no duty upon Benny's Spaghetti Company to correct a dangerous or defective condition upon its own premises pertaining to its invitees or licensees. Concededly, the stairway and door through which plaintiff entered was not a portion of the entranceway into the Broadway Building. The converse is also factually true.

In *Johnston* v. *De La Guerra Properties, Inc.,* 28 Cal.2d 394 [170 P.2d 5], the court held that a tenant is ordinarily not liable for injuries to his invitees incurred outside the leased premises on common passageways over which he has no control. Responsibility in such cases rests upon the owner

who has the right of control and the duty to maintain that part of the premises in a good and safe condition. Benny's Spaghetti Company had no control over the premises or entranceway except to its own business. The effect of the last paragraph of the instructions was to advise the jury that if the stairway and entrance under consideration were so constructed as to constitute a nuisance and that condition was present at the time of the leasing by the Broadway Building Company to Benny's Spaghetti Company, then Benny's Spaghetti Company was not liable for such condition to *an invitee of the Broadway Building Company.* This entire instruction, when considered in connection with the other instructions given on the question of the liability of the owner and the lessee to a licensee and to an invitee cannot be said to be prejudicially erroneous. (*Dennis* v. *City of Orange,* 110 Cal.App. 16 [293 P. 865]; *Burroughs* v. *Ben's Auto Park, Inc.,* 27 Cal.2d 449 [164 P.2d 897]; *King* v. *New Masonic Temple Assn.,* 51 Cal.App.2d 512 [125 P.2d 559]; 15 Cal.Jur., p. 737, § 150.)

Defendant owners contend that whether or not these instructions embody correct principles of law, the giving of them would not justify a reversal of the judgment as to them, since there is no way that these instructions could have affected the verdict of the jury in their favor.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied August 27, 1951, and appellants' petition for a hearing by the Supreme Court was denied September 27, 1951.