[Civ. No. 23233.   Second Dist., Div. Three.   Aug. 31, 1959.]

ALBERT WIESE, Appellant, v. ARTHUR RAINVILLE
et al., Respondents.

Donald C. Kimber, Sanford R. Willford, Frank W. Woodhead and Robert E. Morrow for Appellant.

Harry E. Sackett, Raoul Francoeur, Robert P. Dockeray, Moss, Lyon & Dunn, Sidney A. Moss and Henry F. Walker for Respondents.

WOOD (Parker), J.—In this action for damages for personal injuries, plaintiff appeals from (1) judgment of nonsuit as to defendant Pearce, and (2) judgment, upon a verdict, in favor of defendant Rainville.

As to the judgment of nonsuit, appellant asserts that the evidence was sufficient to support a judgment against Pearce; and that the court erred in rulings as to the admissibility of evidence. As to the other judgment, he asserts error in giving and refusing to give certain instructions.

Defendant Rainville, who was doing business as the Rainville Company, was a sales agent for a plastics molding machine known as "Auto-Vac." Plaintiff was the chief engineer of the Modglin Company, which manufactured plastic articles. Defendant Woodrow Pearce, who was doing business as Pearce's Plastic Models, manufactured plastic articles.

Rainville desired to demonstrate the Auto-Vac machine to persons who were in the business of manufacturing plastic articles. He obtained the permission of Pearce to install one of those machines at Pearce's factory for the purpose of making the demonstration.

One of the machines, which was owned by the Auto-Vac Company (of Fairfield, Connecticut), was installed by Rainville at the Pearce factory about May 1, 1955. Soon thereafter Rainville sent a form letter to several persons, including plaintiff, inviting them to witness a demonstration of the machine at said place. Plaintiff attended that "public" demonstration, where Rainvile and Mr. Stratton, another representative of the Auto-Vac Company, operated the machine and made or formed plastics articles, such as toys. (There was no demonstration, at that time, as to whether the machine could wrap articles in cellophane.) A few days thereafter those representatives went to the office of the plaintiff and discussed the merits of the machine and exhibited samples of the work the machine could do. Plaintiff was interested in ascertaining whether the machine could wrap small articles (made by Modglin) in cellophane. Such wrapping is known as "skin packaging."

A few days thereafter, the plaintiff, another employee of Modglin, and Rainville went to the Pearce factory, where Rainville operated the machine in attempting to wrap a small brush in cellophane. After two such attempts, plaintiff concluded that the wrapping was not satisfactory.

Later, Rainville went to plaintiff's office and exhibited another sample of the packaging which was done by the machine. The cellophane on the sample was wrinkled, and plaintiff said that the packaging was not satisfactory. Rainville said that he would try the machine again, and he suggested that plaintiff be present at the next attempt. They agreed to meet at the Pearce factory at 4 p. m. of that same day, June 28, 1955, to see if Rainville could do a better job of skin packaging with the machine.

When plaintiff arrived at the factory, at the appointed time, Rainville was there and the air and power of the machine "were on" and the machine was ready to be operated. They discussed what they intended to accomplish with the machine —to produce a smoothly wrapped package. Then two attempts were made to package the small brush (which had been used in the prior attempts), but the results were not satisfactory. Then plaintiff asked Rainville if the "drape frame method" (a method different from the method used in the prior attempts) could be used for wrapping the brush. Rainville replied that he did not know any reason the machine could not be used in that manner. Rainville, in proceeding to try that method, raised the clamping frame

about a foot above the molding base of the machine. The plaintiff put his hand under the clamping frame in order to hold a thin sheet of plastic in position while Rainville proceeded to activate an automatic part of the machine by pressing a button. Rainville pressed the wrong button, and the clamping frame went down on plaintiff's hand, causing severe injuries.

The briefs do not state the dimensions of the machine and do not describe it or its operation except in general terms. The jury went to the Pearce factory, observed the machine, heard an expert witness explain the operation of it, and heard plaintiff and Rainville testify (there) as to the manner it was operated at the time the injury occurred. Photographs of the machine, and also a brochure regarding the machine, were received in evidence.

A description of the machine and its operation (as indicated by the photographs, brochure, and testimony) is as follows: It is a box-like metal structure, about 5 feet wide, 8 feet long (front to back), and 6 feet high. The structure has no wall at the upper half of the front; and it has no covering at the front half of the top. In other words, the front upper one-fourth of the structure is not enclosed. At the bottom of that open part (at a place about half way between the top and bottom of the structure) there is a floor or molding base, about 2 feet wide (front to back) and 3 feet long, where the model of the article (to be made) is placed. Also in that open part of the structure, and above the molding base, there are intricate mechanisms which are referred to as the clamping frame and the heating bars. The clamping frame consists of two frames (a top frame and a bottom frame). Each frame, about 3 feet wide (front to back) and 4 feet long, appears to be made of 2-inch by 4-inch wood. The bottom frame remains in a horizontal position, and the mechanism in connection with the top frame is such that the top frame can be lowered against the bottom frame and thereby clamp a sheet of plastic between the two frames. There are adjustable cross bars on the frames so that various sizes of plastic sheets can be clamped between the frames. The whole clamping frame (two frames) can be raised, from the molding base, so that plastic can be inserted and clamped between the two frames; and the whole clamping frame can be lowered, from the elevated position, so that the plastic (which has been clamped in it) can be draped over the mold or article on the

molding base. Also in that open space of the structure, and above the clamping frame, there is a device which contains heating bars for the purpose of heating the plastic sheet after it is in the clamping frame and before the clamping frame is lowered to drape the plastic over the mold. Under the molding base there is a vacuum apparatus which operates, after the heated plastic is on the mold, for the purpose of drawing the plastic smoothly and tightly against the mold. The machine is operated by electricity. Outside and attached to the front of the structure, there is a control panel on which there are 19 control buttons or switches. Each button or switch is labeled as to its function, such as ''Clamp Start,'' ''Down,'' ''Up,'' ''Close,'' etc. The top of the control panel is about a foot below the level of the molding base.

The attempts to skin package articles prior to the accident (and prior to the time plaintiff asked if a different method could be used) were made by the ''vacuum method.'' Under that method the clamping frame is not raised from the molding base, but it remains flat on the base in the ''vacuum drawing position,'' and the plastic or cellophane material is laid on the article and is heated, and then the vacuum apparatus is operated for the purpose of drawing the plastic around the article. As above stated, the method used at the time of the accident was the ''drape frame method.'' Under that method the machine is operated as follows: the clamping frame is raised about a foot above the molding base; the two frames (which comprise the clamping frame) are opened or separated by raising the top frame; a sheet of plastic is placed on the bottom frame; the top frame is closed or clamped against the plastic and the bottom frame; the plastic is heated by the heating device; then the whole clamping frame is lowered so that the heated plastic is draped over the article on the base; and then the vacuum apparatus is operated to finish the packaging process.

With respect to the occurrences at the time of the accident, plaintiff testified that on June 28, after two unsatisfactory attempts on that day to package the brush, he asked Rainville if the drape frame method could be used; Rainville replied that he did not know any reason the machine could not be used in that manner; then Rainville raised the clamping frame, and a thin sheet of plastic (cellophane) was placed between the top and bottom frames; the thin plastic, not having sufficient support under it, fell through the bottom frame; plaintiff looked for a rigid object which could be used

to support the plastic (while the top frame was being lowered to clamp the plastic against the bottom frame); the only objects available were two strips of heavier plastic, but those were not satisfactory to eliminate all the wrinkles in the thin plastic; then Rainville suggested that plaintiff hold those plastic strips under the bottom frame, and he (Rainville) would close the top frame and proceed with the packaging (by lowering the whole clamping frame to the molding base); plaintiff proceeded to do that, and he put his hands under the clamping frame (his hands were about 12 inches inside the machine); Rainville placed the thin plastic over the frame under which plaintiff was holding the two heavier strips of plastic; Rainville asked if plaintiff was ready; plaintiff asked if Rainville was sure the machine was set in the proper manner for that operation; he replied in the affirmative; plaintiff said he was ready; then Rainville, who was standing at the right side of plaintiff, pushed the wrong button, and the clamping frame came down on plaintiff's hand; plaintiff called for help; Rainville said, ''Oh, my God, what have I done now?''

Mr. Rainville testified that on June 28, when they were about to make the third attempt on that day, the clamping frame was down on the molding base, as ''it has to be in order to do skin packaging''; plaintiff had laid the brush on the mold, and either plaintiff or Rainville had placed the plastic on the brush (which was to be packaged); then Rainville pushed the two outside buttons on the control panel and closed the top frame of the clamping (drape) frame; at that time plaintiff asked if the drape frame could be raised without opening the top frame; Rainville replied in the negative, and he said further that every time the drape frame comes up, the top frame opens; plaintiff said, ''Do it my way''; Rainville raised the clamping (drape)frame, and the top frame opened and the plastic (which had been clamped in the frame) fell through the lower frame; Rainville said, ''There is the proof of it, Al [referring to plaintiff]. It is not supposed to be done that way. It isn't set up. The machine isn't even made for that''; plaintiff picked up two strips of plastic and said that if he held those strips under the clamping frame so that the other plastic would not fall through the lower frame, then they might be able to close the top frame and hold the plastic in the clamp; Rainville replied that that was wrong and that the drape frame process was not used in skin

packaging; plaintiff told him to go ahead and put the plastic over the top of plaintiff's hands; plaintiff put his hands under the clamping frame, and then he told Rainville to "be careful and push the two outside buttons." (It was established that it was necessary to push the two outside buttons simultaneously in order to close the top frame. Immediately before the accident, when Rainville was proceeding to push the buttons, Rainville was standing at the right side of plaintiff—as they were facing the machine). Mr. Rainville testified further that (after plaintiff told him to push the two outside buttons) he put his right hand on the button at the right end of the panel, and he reached (with his left hand) around and past plaintiff in trying to feel for the button at the other end of the panel; he went "from button to button" and when his hand was on the next to the last button, the plaintiff turned his hip and hit Rainville's hand and made pressure on the next to last (wrong) button.

Defendant Pearce, the owner of the factory known as Pearce's Plastic Models, testified (under Code Civ. Proc., § 2055) that he manufactured aircraft windows, and that he also did laboratory work; he had about 15 employees; about February, 1955, Rainville told him that an Auto-Vac machine would be sent to Rainville for demonstration purposes; they had a discussion relative to placing the machine in Pearce's factory; Pearce agreed to allow Rainville to place the machine there under conditions which they discussed; the substance of their discussion was that the machine would be there at no charge or commission or anything like that, and Pearce would get no profit from it, Rainville would "hook it up," would carry his own insurance, that Pearce should have the first option to buy the machine, and that his employees might use it. He testified further that he was present when the machine was placed in his factory about May 1; Rainville handled the transportation of the machine; the first demonstration of the machine was on the day it was installed; Pearce received a letter from Rainville (copy of Exhibit G) relating to a public demonstration of the machine to be held at Pearce's factory; he (Pearce) did not know whether the "safeguard" was on the machine on the day of the accident; he did not remove the safeguard; he did not know when his employees first removed the safeguard; he did not own any interest in the Rainville Company or the Auto-Vac Company.

At the close of plaintiff's case, the motion of defendant

Pearce for a nonsuit was granted. Then defendant Rainville rested his case. The jury returned a verdict in his favor, and judgment was entered thereon.

■ Appellant contends that he was an invitee of Pearce, and that Pearce owed him the duty of keeping the "guard" on the machine when appellant was present, or owed the duty of warning him of the dangerous condition of the machine when the guard was not on it. Appellant's argument, in support of such contention, is to the effect that Pearce consented to the placing of the machine on his premises, he was present when the first public demonstration was made, he permitted his employees to use the machine, and he had the first option to buy it. The complaint alleged that appellant (plaintiff) was a business invitee of Pearce; that Pearce maintained the machine on his premises; that the machine was in a defective and dangerous condition; and that such condition was known to Pearce. The evidence was not legally sufficient to prove that appellant, at the time of the accident, was on the premises for a purpose which was for the mutual benefit of himself and Pearce. Rainville and appellant had gone to the premises on the day of the accident for the purpose of testing the usability of the machine for wrapping, to the satisfaction of appellant, a small brush which had been manufactured by appellant's employer (the Modglin Company). Pearce was not present while they were operating the machine on that day. There was no evidence that such wrapping of that article would be of any benefit to Pearce. Rainville and appellant were there on that day for purposes which did not pertain to Pearce's business. It is true that Pearce gave Rainville permission to place the machine on the premises, and that, at the time of the accident, Rainville and appellant were on the premises with the permission of Pearce. In *Fisher* v. *General Petroleum Corp.*, 123 Cal.App.2d 770 [267 P.2d 841], it was said, at page 778: "An invitation to use the premises of another is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using the premises. Mere permission of an owner or allowing a person to enter and use a certain portion of the premises is indicative of a license merely and not of an invitation." In *Aguilar* v. *Riverdale C. C. Assn.*, 104 Cal.App. 263 [285 P. 889], one Goodrich, who was in the business of drying fruit, obtained defendant's permission to go upon defendant's

premises and use defendant's drying machine to dry fruit. While the plaintiff therein, who was Goodrich's employee, was using the machine in performing work for his employer, his hand came in contact with a revolving fan and he was injured. Plaintiff therein contended that he was an invitee. In reversing a judgment for plaintiff, the court said (p. 267): "The application of the foregoing legal principles to the situation in the case before us clearly demonstrates that it possesses none of the elements essential to establish respondent's [plaintiff's] status as an invitee, for admittedly he did not enter appellant's premises on any mission connected with appellant's business, nor in which the latter had any common interest; nor did he go there as a result of any enticement . . . nor in response to any invitation, on appellant's part. . . . His status was therefore clearly that of a bare licensee, and as such he assumed all the ordinary risks and perils attached to the condition of the premises, and the manner in which the same or the business conducted thereon were maintained or operated. . . . Nor does the fact that appellant granted respondent permission to come upon the premises affect respondent's status as a bare licensee, for it is well settled that mere permission of an owner to enter and use a portion of his premises does not of itself amount to an invitation." The evidence was not legally sufficient to prove that appellant, at the time of the accident, was on the premises as an invitee of Pearce.

The court did not err in granting Pearce's motion for a nonsuit.

■ Appellant contends further that the court erred in sustaining Pearce's objections to three questions (asked appellant) which, according to appellant's opinion, were material on the issue as to whether appellant was an invitee of Pearce. The first question was: "Does Pearce Plastics or did Pearce Plastics, at the time of this accident, produce items that your company would be likely to purchase?" The second question was: "[I]s your company in any business, or were they in any business relationship to the Pearce Plastics Company in relation to purchase or vendee or vendor relationship?" Those were compound questions, relating to both present and past time. The part of each question relating to present time (i.e., the time of trial—about two years after the accident) was immaterial. In *Board of Trustees* v. *Schuyten*, 161 Cal.App.2d 50 [326 P.2d 223], it was said at page 54: "The vice of the compound or duplicitous question is

generally recognized. [Citations.] Particularly is such a question objectionable when it includes both inadmissible and admissible matters. In such cases the objection to the entire question is properly sustained.'' The third question was: ''Did the Pearce Plastic Company, at the time the loss occurred, at the time you went over to the Pearce Plastic Company, produce any item that your company would be interested in purchasing?'' This question was also a compound question, since there was evidence that appellant had gone to the Pearce Company on three occasions. The part of the question relating to times other than the time of the accident was immaterial. After the objections to the first two questions were sustained, appellant's counsel made statements to the effect that the questions were material in that appellant was claiming that he was an invitee of Pearce. The judge replied to the effect that appellant would be permitted to prove that, but would not be permitted to prove it ''by the type of question you have just asked'' or by ''the way you are going about it.'' It thus appears that the judge directed attention particularly to the form of those questions, and that he did not, by those rulings, foreclose appellant from presenting evidence, by proper questions, on the ''invitee'' issue. It also appears that appellant did not make an offer of proof. None of the questions indicated that the answer thereto would be favorable to appellant. It cannot be determined from the record whether the answers would have been favorable to appellant. The court did not err in sustaining the objections to those questions.

Appellant also asserts that the court erred in sustaining Pearce's objection to a certain question which appellant asked Pearce on cross-examination (under Code Civ. Proc., § 2055). The question was: ''Are you and were you, on that date [date of accident], familiar with the mechanisms of the machine?'' That also was a compound question. It was immaterial whether Pearce, at the time of trial, was familiar with the mechanism. The court did not err in sustaining the objection.

Appellant also contends that the court erred in sustaining Pearce's objection to the following question, which appellant asked Pearce: ''When did you first know that it [the 'guard' part of the machine] was removed, Mr. Pearce?'' The objection was upon the ground that the question was irrelevant. Thereupon the judge said, ''I assume you mean

prior to the accident." Counsel for appellant replied that he was "just trying to find out when he knew." After the objection was sustained, counsel for appellant asked when it was prior to the accident that Pearce first knew that the guard was removed. Following that question, there was an objection, and also a discussion as to whether the question had been answered. The judge suggested that counsel for appellant "start all over again." Then counsel for appellant asked: "Do you know when your employees first removed the safeguard from the machine?" Appellant answered, "No." Thereupon counsel for appellant said that he had no further questions. Under such circumstances, the ruling sustaining the objection to the question (as to when Pearce first knew that the guard was removed) was not prejudicially erroneous.

Appellant also contends that the court erred in instructing the jury on the doctrine of assumption of risk. Defendant Rainville did not plead assumption of risk but did plead contributory negligence. Defendant Pearce pleaded assumption of risk and contributory negligence. Pearce submitted five instructions on assumption of risk. Rainville did not request any instruction on assumption of risk. Pearce, of course, was not a participant in the trial after his motion for a nonsuit was granted. The court, however, gave the five instructions on assumption of risk, which had been requested by Pearce.

This court wrote an opinion in this case (Cal.App.) 337 P.2d 561, reversing the judgment on the ground that the court erred in instructing the jury on the doctrine of assumption of risk. A rehearing was granted because the pretrial conference order of the pretrial judge stated that assumption of risk was an issue in the case. On the previous hearing on appeal, the pretrial order was not in the record on appeal, and the briefs did not refer to the pretrial order. It is not clear whether the pretrial judge inadvertently stated in the pretrial order that assumption of risk was an issue in the case. It does not appear, however, that any objection was made to the order. As correctly stated in the former opinion, the defendant Rainville did not plead assumption of risk. In connection with the petition for rehearing, the attorneys stipulated that a certified copy of the pretrial order might be filed herein. The copy has been so filed. The pretrial order was before the trial judge and it is to be assumed that he considered the order in determining the instructions to be given. The pretrial conference order superseded the

pleadings as to the issue of assumption of risk. (See *Baird* v. *Hodson,* 161 Cal.App.2d 687, 690 [327 P.2d 215]; and *City of Los Angeles* v. *County of Mono,* 51 Cal.2d 843, 847 [337 P.2d 465].)

The five instructions on assumption of risk, which were given, were in substance as follows:

1. A person assumes a risk when he voluntarily exposes himself to danger, or when he knows that a danger exists in the operation of property and he voluntarily remains within the area of danger. A person who thus assumes a risk is not entitled to recover for damage caused him without intention, and which damage resulted from the dangerous condition to which he exposed himself.

2. Distinction should be noted between assumption of risk which bars recovery and the ordinary acceptance of common risks that lie in the possibility that others will not perform their duties. As to this latter kind, a person will not be barred from recovery for damage by the fact that, while he is exercising ordinary care, he assumes that others will perform their duties.

3. To bar recovery, assumption of risk must be voluntary. To be voluntary, the person must have knowledge of the danger and must have freedom of choice. This freedom of choice must come from circumstances that provide him a reasonable opportunity to refuse to expose himself to the danger.

4. Attention is called to a distinction between contributory negligence and assumption of risk. Contributory negligence must be a proximate cause of the injury, but assumption of risk will bar recovery of damage although it plays no part in causing the accident except merely to expose the person to danger.

5. In determining whether a person had knowledge of a dangerous situation and whether, with such knowledge, he assumed a risk so as to bar recovery of damages, you may consider his age, experience, capacity, and all the surrounding circumstances as shown by the evidence. The court did not err in giving those instructions.

Appellant also contends that the court erred in refusing to give an instruction requested by him, which instruction commenced as follows: "California Administrative Code, Division of Industrial Safety, Title 8, reads as follows: Division of Industrial Safety General Industry Safety

Orders." The instruction thereafter consisted of General Industry Safety Orders, numbers 3601, and 3608, and 3760. Those orders as set out in appellant's brief in single space printing cover three pages of the brief, and the orders contained many terms and expressions descriptive of mechanical equipment. Order Number 3601 was to the effect that all points of operation guards shall be properly set up and maintained in safe condition. Order Number 3608 was to the effect that Power Presses and Foot and Hand Power Presses shall be guarded in certain ways. The ways were specifically described therein in subsections (a) to (k), inclusive. Order Number 3760 was as follows: "Every thermosetting plastic molding press shall be guarded by any of the methods covered in [Order] 3608, Power Presses and Foot and Hand Power Presses."

In *Porter* v. *Montgomery Ward & Co., Inc.*, 48 Cal. 2d 846 [313 P.2d 854], it was held that safety regulations are intended to afford protection to the general public in places of employment. In *Lehmann* v. *Los Angeles City Board of Education*, 154 Cal.App.2d 256 [316 P.2d 55], it was held that safety regulations were applicable where a student in a printing class in a public school was injured while using an unguarded printing press. It was said therein, at page 260: "It was thought for some time that the regulations of the Division of Industrial Safety were devised for the sole purpose of imposing duties upon employers for the exclusive benefit of their employees. Some of the decisions so held. It is now settled that the regulations have a broader purpose, and that this could not be accomplished without construing them as applicable to the general public, as declared in the Porter case. The primary purpose of the regulation of the Division of Industrial Safety is for the protection of employees, and while they no doubt are inapplicable where conditions of employment do not exist, it would seem that whenever they do exist the regulations are applicable unless there is to be found in them or in applicable law a purpose to exclude certain conditions. The only conditions that are excepted are those specified in section 6302, Labor Code, which makes the regulations inapplicable to 'a place the safety jurisdiction over which is vested by law in any State or Federal agency other than the division.' "

In the present case the plaintiff and defendant Rainville were experimenting with the machine in testing its usability for wrapping a small brush with cellophane. Plain-

tiff was not an employee of Rainville or any one at the place where the machine was located, but Rainville had invited him there to see if Rainville could do a better job of wrapping with the machine than had been done on the two prior attempts. Rainville had caused the machine to be installed there for the purpose of demonstrating it to prospective purchasers. Plaintiff was an employee of the Modglin Company, which was a prospective purchaser. Rainville permitted plaintiff to assist him in demonstrating the machine. Plaintiff testified that he did not know that there was a safeguard that was attachable to the machine. The court erred in refusing to give plaintiff's requested instruction regarding the safety orders.

Appellant also contends that the court erred in giving Rainville's requested instruction, which was as follows: ''You are instructed that there have been no claims advanced or allegations made that the operation of the machine involved in this case was illegal in any respect. You shall not consider any opinion held or expressed by any member of the jury as to any law affecting the required use of any safeguards in ordinary demonstration operations of the machine, but you are to consider only the law as you are otherwise instructed by the court. You are admonished that the incident resulting in injury to the plaintiff arose out of a demonstration or joint testing of the capabilities of the Auto-Vac machine by the plaintiff as Chief Engineer for his employer and by the defendant Arthur Rainville as a salesman for the Auto-Vac Company.'' Plaintiff alleged in the complaint that Rainville so negligently and unlawfuly operated the machine as to cause it to injure plaintiff. It thus appears that the first sentence of the requested instruction was erroneous in that it instructed that ''. . . there have been no claims advanced or allegations made that the operation of the machine . . . was illegal in any respect.'' The court erred in giving that instruction.

Appellant also contends that the court erred in refusing to give his requested instruction to the effect that Rainville had the last clear chance to avoid the accident. His argument is that Rainville had a last clear chance to avoid the accident by immediately pressing the emergency stop button. The evidence shows that the clamping frame was about 12 inches above the molding base when Rainville pressed the down button, and that when the button was pressed the

frame came down on plaintiff's hand. It does not appear that the time elapsing, between the time the button was pressed and the time the injury occurred, was sufficient to afford Rainville any chance to avoid the accident. Plaintiff testified that he did not have time to get both hands out. The court did not err in refusing to instruct the jury on the doctrine of last clear chance.

The judgment of nonsuit in favor of defendant Pearce is affirmed. The judgment in favor of defendant Rainville is reversed. Defendant Pearce to recover his costs. Plaintiff to recover his costs, except one-half the cost of his opening and closing briefs.

Shinn, P. J., and Vallée, J., concurred.