[No. B187840. Second Dist., Div. Eight. July 22, 2008.]

RITTER & RITTER, INC. PENSION AND PROFIT PLAN et al., Plaintiffs and Respondents, v.
THE CHURCHILL CONDOMINIUM ASSOCIATION et al., Defendants and Appellants.

**COUNSEL**

Hillel Chodos, Michael A. Chodos and Rehema Rhodes for Defendants and Appellants.

Minton Ritter; Feldsott & Lee, Stanley Feldsott and Martin L. Lee for Plaintiffs and Respondents.

**OPINION**

**COOPER, P. J.—**

## INTRODUCTORY INFORMATION

### BACKGROUND INFORMATION

*The Parties*

The Churchill is a 110-unit, 13-story condominium building in the "Wilshire Corridor" in the Westwood area of Los Angeles, California. Defendant and appellant (The Churchill) is a California nonprofit mutual benefit corporation. The individual defendant and appellant directors of The Churchill are Tibor Breier, Martha Brown, Theodore Nittler (referred to as Edwin Nittler in some court records), Ruth Hochberg and Basil Anderman

(the Board).[1] Each of the individual directors is also an owner in the building and receives no compensation for services as a director. Minton and Roberta Ritter are brother and sister. The Ritter & Ritter, Inc. Pension and Profit Plan, and Ritter and Ritter Family Investment Trust, purchased adjoining units (3H in 1995 and 3J in 1998) in The Churchill. Roberta Ritter is the trustee of both trust entities and a plaintiff in this litigation.[2]

*The Churchill Condominium*

The Churchill was built in 1960 with construction completion in 1962. Built originally as an apartment complex, it was converted into a condominium association in 1976, at which time its declaration of establishment of covenants, etc. (hereinafter CC&R's) was recorded. The CC&R's were followed with house rules documents. Together these documents form the governing documents for the organization.

The Churchill is constructed of a series of horizontal concrete slabs attached to and supported by a rectangular structure of steel girders and beams. The ceiling of each unit is actually a "drop ceiling" below the next concrete slab. Above the "drop ceiling" and between it and the concrete slab above is an area referred to as the "plenum."

The various pipes, conduits and ducts needed to serve each unit run up and down central shafts in the building, then branch out sideways through this "plenum" area, and then go up into each unit through slab penetrations (i.e., holes) made in the concrete slab during the building's original construction.

The slab penetrations are holes in the concrete that range in size from six inches in diameter to 12-by-12-inch holes. These slab penetrations were created at the time of the initial construction of the building. The purpose of the slab penetrations was to allow space for passage by the vertical plumbing and piping which runs throughout the structure. The original architectural construction plans and the city permit requirement at the time called for these slab penetrations to be "fire proofed." However, this did not occur and The Churchill's original construction (including these slab penetrations) passed all applicable building inspections and The Churchill duly received its certificate of occupancy in 1962. The Churchill has never received any order to change or upgrade these slab penetrations. Existing Los Angeles building codes allow unfilled floor penetrations to remain as an existing, nonconforming condition.

---

[1] The individual directors comprised The Churchill's entire five-member board of directors throughout all the events in question and through the trial. Several of the directors have since retired and have been replaced on the board.

[2] Plaintiffs and respondents will be referred to collectively as the Ritters.

The dispute in this case arose over the existence of these slab penetrations and the duty, if any, of The Churchill to repair the condition that the penetrations were not properly finished during the initial construction of the building.

## STATEMENT OF THE CASE

In 1998, the Ritters complained to appellants about smoke odors in unit 3H, a unit the Ritters never remodeled. In 1999, the Ritters purchased a second unit, 3J, and discovered that this unit had similar odor problems. After bringing this issue to the attention of The Churchill both before and after unit 3J was remodeled, the manager, Bill Brick, told the Ritters that the odor problems originated in their air-conditioning unit and that their air-conditioning unit had to be replaced. The Ritters replaced the air-conditioning unit, but the new unit provided no relief from the odors. The Churchill's management responded to the Ritters' continued complaints by stating that there was no more that could be done and that no other homeowners complained of similar problems.[3]

In late 2003, a new tenant in the Ritters' unit 3J complained about cigarette odors in the unit. The Ritters demanded that The Churchill identify the source of the odors and abate it. This demand triggered a series of investigations by the parties and the Board decision which is the subject of this lawsuit. Extensive investigation and communication between the parties ensued.

The Ritters hired their own expert engineer who conducted his own investigation. He reported that the source of the odors was the slab penetrations and offered his opinion that these holes constituted a fire hazard and should be filled or fire-stopped.

The Board hired a professional engineer and a ventilation system expert to investigate the source of the problem. Their expert reported that the problem was caused, in part, by the slab penetrations in the Ritters' unit 3J's floor. According to the expert, these holes allowed odors to travel between the 2J unit below, and the Ritters' unit 3J. The Churchill's engineer also indicated slab penetrations posed a significant fire safety risk.[4]

After receiving its expert's report and conducting its investigation and communication with the Ritters, the Board concluded based on the 1999 building code the Ritters should have filled any floor penetrations exposed

---

[3] The Ritters' investigation of previous board hearing minutes demonstrated numerous incidents where other homeowners complained of odor problems.

[4] Ron Mark's January 6, 2004 report was discussed extensively at trial and admitted at trial as exhibit 158.

during their remodel, and that doing so now would abate the odor problem. The Board believed that the Ritters were responsible for making the holes in the slabs and therefore they were also responsible for fixing them and would be expected to enter the 2J unit below, pay for the homeowner to stay in a hotel during the repairs and make all necessary repairs within 30 days.

The Ritters demanded a hearing before the Board. They also demanded that Board and the association do the work to fill the slab penetrations adjacent to their own unit and additionally repair all penetrations throughout the entire building.

The Board agreed to the Ritters' request and on March 9, 2004, held a formal adjudicative hearing of the Ritters' protest and demands. At the hearing, the Ritters were represented by counsel and submitted evidence and witness testimony. After considering all such materials as well as the report of their own expert and the advice of their counsel, the Board concluded (1) that the Ritters' remodel in 1999 "triggered" the obligation to fill the floor penetrations adjacent to their units, which obligation came to light only when their tenant complained of odors in 2003; (2) The Churchill did not have a legal obligation to fill such holes because they were "existing, non-conforming" conditions; (3) The Churchill would not at this time choose to undertake the expense of making the corrections; and (4) the Ritters were required by law and by the CC&R's to fill the penetrations adjacent to their own units and would be ordered to do so.[5]

The Board also imposed daily fines of $200 per day on the Ritters for failure to fill the holes adjacent to their own units, but expressly indicated that all such fines would be waived if the Ritters filled the holes within 30 days after the order. The Churchill's Board notified the Ritters of their decision in writing. It attached a bid from a contractor offering to complete the work adjacent to their units for approximately $2,700 per unit. The Ritters declined the Board's offer.

*The Current Litigation*

On May 17, 2004, the Ritters sued The Churchill and each of its then directors individually. The Ritters' first amended complaint set forth causes of

---

[5] The Board also adopted a new policy that in all subsequent remodels at The Churchill, one of the requirements for approval would be that the owner fill the slab penetrations adjacent to his or her unit. This was based on its advice that current codes require these penetrations to be filled when a remodel is done; so this policy was simply part of The Churchill's general requirement in the house rules that all remodels must comply with all applicable building codes. The Churchill has since implemented that policy on several occasions without controversy.

action for nuisance, negligence, breach of fiduciary duty, breach of the CC&R's, breach of the covenant of good faith and fair dealing, permanent injunctions and declaratory relief. They sought financial damages due to odor intrusion into their unit. They also sought an injunction requiring The Churchill to fill all slab penetrations throughout the building, at association expense. They sought damages of at least $200,000 for diminution in value to their units as a result of the unfilled slab penetrations.

The Churchill cross-complained to require the Ritters to fill the penetrations adjacent to their units and for recovery of the $200 daily fines imposed for their failure to do so. By the time of trial, these daily fines had amounted to $77,000.

The matter went to trial on May 2, 2005, and concluded on May 19, 2005.[6] The legal causes of action were presented to a jury and the equitable causes of action were presented to the trial judge. The legal causes of action presented to the jury included claims that The Churchill has breached the CC&R's, acted negligently and breached their fiduciary duty against the Ritters. General verdicts and special interrogatories were submitted to the jury. The jury was instructed and began their deliberations. The jury returned their verdict on May 20, 2005.

The jury returned a general verdict that stated:

"On the Ritter plaintiffs' claim for breach of the CC&Rs

"We find in favor of the Ritter plaintiffs and against The Churchill defendants . . . .

"On the Ritter plaintiffs' claim for breach of fiduciary duty

"We find in favor of the Ritter plaintiffs and against The Churchill defendants . . . .

"On the Ritter plaintiffs' claim for negligence

"We find in favor of the Ritter plaintiffs and against The Churchill defendants.

"On The Churchill Cross-Complaint . . . .

[6] The Ritters settled their cross-complaint against cross-defendants HarBro, Inc., and L.K. Plumbing & Heating, Inc., at trial and dismissed same with prejudice. The cross-complaining actions against cross-defendant The Churchill Condominium Association became moot based on the jury's verdict.

"We find in favor of cross-defendants the Ritters and against cross-complainant The Churchill."

Special interrogatories were submitted to the jury and the jury returned the forms with the following responses:[7]

"We answer the questions submitted to us as follows:

"1. Did The Churchill defendants breach any provisions of the CC&R's?

| | |
|---|---|
| "The Churchill | *Yes* |
| "Basil Anderman | *No* |
| "Tibor Breier | *No* |
| "Martha Brown | *No* |
| "Ruth Hochberg | *No* |
| "Edwin Nittler | *No* |

"2. If so, what provisions?

"*5.1(3)–5 and 5.1(6)*

"3. If the answer to Number 1 is 'Yes,' were the Ritter plaintiffs harmed by the Churchill defendants?

"*Yes*

"4. What are the Ritter plaintiffs' damages?

"Economic loss: *$4,620*

"5. Were The Churchill defendants negligent?

| | |
|---|---|
| "The Churchill | *Yes* |
| "Basil Anderman | *No* |
| "Tibor Breier | *No* |
| "Martha Brown | *No* |
| "Ruth Hochberg | *No* |
| "Edwin Nittler | *No* |

"6. If the answer to Number 5 is yes, was The Churchill defendant's negligence a substantial factor in causing harm to plaintiffs?

---

[7] We reproduce only those portions of the general verdict reflecting the jurors' entries. All italicized information shown above was added to the forms by the jury.

*"Yes*

"7. Were the Ritter plaintiffs negligent?

*"Yes*

"8. Was the Ritter plaintiffs' negligence a substantial factor in causing harm?

*"Yes*

"9. What percentage of responsibility for the Ritter plaintiffs' harm do "you assign to the following?

| "The Ritter Plaintiffs | *25%* |
| "The Churchill | *75%* |
| "[¶] . . . [¶] | |
| "Total | *100%* |

"10 What amount of fines do you award against the Ritter cross-defendants, if any?

*"$0."*

The court tried the equitable causes of action and on October 3, 2005, the court issued its final judgment. The verdict form stated:

*"VERDICT FORM*

"1. Plaintiffs Ritter & Ritter, Inc. Pension and Profit Plan, Roberta Ritter Trustee, Roberta Ritter Trustee of the Ritter Family Investment Trust dated January 13, 1986, and cross-complainants/cross-defendants Ritter & Ritter, Inc. Pension and Profit Plan, Roberta Ritter Trustee, Roberta Ritter Trustee of the Ritter Family Investment Trust dated January 13, 1986, and Roberta Ritter, individually, shall recover from the defendants the sum of $___ as and for their attorney fees, and the sum of $___ as and for their costs.

"2. The individually named directors did not breach their fiduciary duty.

"3. Pursuant to Code of Civil Procedure § 1060, the court will and does retain ongoing jurisdiction to enforce the above recited equitable and/or injunctive decrees (to wit, Paragraph 2 above)."

*Posttrial Proceedings*

After trial, but prior to the court's issuance of the judgment herein, the following motions were heard by the trial court: (1) The Churchill defendants' motion for a minute order entering dismissal of the Ritters' first, second and sixth causes of action; (2) Churchill defendants' motion for judgment notwithstanding the verdicts; (3) the Ritters' motion for reconsideration and revocation of order made July 15, 2005, that the Ritters are to pay for fire-stopping on common area adjacent to units 3H and 3J and/or request for court on its own motion to reconsider same. On August 24, 2005, the court granted the Ritters' motion for reconsideration and clarified its order to provide that defendant, The Churchill, is to pay at its sole cost and expense for the cost of fire-stopping the slab penetrations adjacent to the Ritter plaintiffs' units 3H and 3J.

On July 15, 2005, the court issued an order following arguments on The Churchill defendants' motion for judgment notwithstanding the verdicts, as follows: "The motion—so to the extent that you're requesting judgment notwithstanding the verdict, that's denied as to the general verdict. [¶] I will, however, grant your motion to the extent that it finds each one of the individual named persons, directors, that—the judgment will be they did not breach a fiduciary duty."

The trial court filed its written judgment on October 3, 2005, which stated: "On July 13, 2005, the Court ruled thereon in favor of the plaintiffs and against defendants, and each of them as follows: [¶] 1) Within thirty days after entry of the judgment, The Churchill Condominium Association and its Board of Directors shall give written notice to all of the members of the Churchill Condominium Association . . . . [¶] 2) The Association is ordered to fire stop and seal all of the slab open penetrations adjacent to plaintiffs' units, to wit: 3H and 3J, at the Association's sole cost and expense, within sixty days of entry of the judgment. [¶] 3) All fire stopping is to be done with appropriate fire stopping material with a two hour fire rating. [¶] 4) The Board of Directors is ordered to call a special meeting of the members with suitable experts in attendance to explain to the membership the nature and extent of these slab penetrations, the fire and safety hazard posed by lack of fire stopping, and the fact that the ceiling and fire stopping of the slab penetrations is an Association responsibility pursuant to the provisions of the Declarations of Covenants, Conditions and Restrictions." The trial court denied the Ritters' request for a mandatory injunction requiring The Churchill and the Board to fill all the slab penetrations throughout the building; instead it ordered them to fill the penetrations adjacent to the Ritters' two units. The trial court ordered The Churchill and the Board to give all the members

notice of the existence of the slab penetrations and of the fact that they represent a fire hazard and call to a general meeting of the homeowners association, with experts in attendance, to explain the situation to the members and to obtain their input.

The Board promptly complied with the injunctive order. The penetrations next to the Ritters' units were filled and a general meeting was held. At the meeting, the members voted overwhelmingly not to incur the cost to fill the building's slab penetrations. The vote was 78 against to three in favor.[8]

The Churchill and the directors timely filed their notice of appeal and notice of election on November 29, 2005, and December 9, 2005, respectively.

## CONTENTIONS ON APPEAL[9] AND STANDARD OF REVIEW

We elect to restate appellants' statement of contentions as presenting the following issues: (1) the general verdict and special findings are inconsistent and irreconcilable and the special findings control; (2) the CC&R's alone determine the rights and obligations between the parties; (3) the trial court erred in the application of the rules set forth in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249 [87 Cal.Rptr.2d 237, 980 P.2d 940]; the trial court erred in instructions submitted to jury; (5) the trial court erred in ordering the injunction; and (6) the trial court erred in determining the Ritters were the prevailing parties.[10]

---

[8] Two of the "yes" votes were from the Ritters.

[9] Appellants' opening brief lists the following as their contentions on appeal.

1. The jury's special findings are inconsistent and irreconcilable with the general verdicts.

2. The jury's special findings exonerating the individual directors cannot be harmonized with the general verdicts, so the special findings must control and judgment directed for appellants.

3. The trial court failed to give effect to the governance, approval and cost allocation provisions of The Churchill's CC&R's or to accord the required deference to the good faith and fully informed decisions of The Churchill's Board.

(a) The Churchill CC&R's and house rules govern the rights, duties and discretion of The Churchill's Board, and consign to the Board the decision whether to undertake building improvement projects.

(b) The trial court was required to defer to the Board's good faith decision on a fundamental cost-benefit issue consigned by the CC&R's to the Board's discretion.

4. The trial court submitted conflicting legal theories to the jury and failed to properly instruct them on the rights and duties of The Churchill and its directors.

5. The trial court's injunctive order is manifestly erroneous and unsupported by any findings of wrongdoing.

6. The trial court's conclusion that the Ritters were the "prevailing parties" entitled to recover their entire $531,159 in attorney fees and costs was erroneous and must be revised.

[10] There are contentions of error scattered throughout appellants' briefs. Not all of these contentions are mentioned in appellants' summary of contentions. (See, *ante*, fn. 9.) For

In reviewing the evidence on appeal, all conflicts must be resolved in favor of the judgment, and all legitimate and reasonable inferences indulged in to uphold the judgment if possible. When a judgment is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the judgment. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Crawford v. Southern Pacific* Co. (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

To the extent that the contentions on appeal raise the need to review the sufficiency of the evidence to support a jury verdict and the associated judgment, the Court of Appeal is ordinarily limited to review of whether the judgment is supported by substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) "When considering a claim of insufficient evidence on appeal, we do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment." (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834], disapproved on another ground in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352, fn. 17 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) We review all legal issues de novo. The existence of duty is a question of law to be decided by the court. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1188 [91 Cal.Rptr.2d 35, 989 P.2d 121].)

## DISCUSSION

*General Principals Relating to Condominium Associations*[11]

To provide context for the following discussion, we begin with some basic legal principles. First among these is an understanding of the general nature

example, appellants argue that the trial court erred by granting the Ritters' "Motion for Reconsideration and Revocation of order made July 15, 2005 that Ritters are to Pay for Firestopping on Common Area Adjacent to Units 3H and 3J and/or Request for Court on its Own Motion to Reconsider Same." The trial court granted the motion and corrected its prior order that the Ritters pay for the fire-stopping of the slab penetrations adjacent to their units and instead ordered The Churchill to pay this cost. We find no error in the trial court's order. The order for the Ritters to pay for the repair was itself inconsistent with both the jury verdict and the trial judge's own rulings.

[11] Since 1986, much of the statutory law governing the formation, operation and management of common interest developments has been consolidated and is contained in the Davis-Stirling Common Interest Development Act. (Civ. Code, § 1350 et seq.) All further undesignated statutory references are to the Civil Code.

of a nonprofit homeowners association; next is the nature of the liability of such an association and its directors.

■ Under California law, a "condominium project" is a form of common interest development. A "condominium" is "an undivided interest in common in a portion of real property coupled with a separate interest in space called a unit . . . ." (§ 1351, subd. (f).) Unless the governing documents provide otherwise, the common area of a condominium project is owned by the owners of the separate interests as tenants in common. In addition to the combined ownership of the two estates enumerated above, the major characteristics of a condominium include an agreement among the unit owners regulating the administration and maintenance of the property. The agreement is reflected in the governing documents of the association which includes the declaration and any other documents, such as bylaws, operating rules of the association, and articles of incorporation which govern the operation of the common interest development. (§ 1351, subd. (j).) The development's restrictions should be contained in its recorded declaration, but may also be contained in an association's internal rules or bylaws.[12] (§§ 1353, 1354.) The CC&R's bind all owners of separate interests in the development.[13]

■ After its creation, a common interest development is managed by an association (also known as homeowners association). (§ 1363.) Associations are responsible for the maintenance of the development's common areas. An association can be unincorporated or incorporated. (§ 1363, subd. (a).) Most associations are incorporated under the Nonprofit Mutual Benefit Corporation Law. (Corp. Code, §§ 7110–8910.) Unless the governing documents provide otherwise, an incorporated or unincorporated association may exercise the powers granted to a nonprofit mutual benefit corporation. (§ 1363, subd. (c).) The association is governed by a board of directors and the powers of the directors are enumerated in the development's governing documents. State and federal statutes as well as common law impose obligations on the directors.

---

[12] The enforceable provisions of an association's governing documents are often referred to as covenants, servitudes or CC&R's.

[13] Section 1354 provides: "(a) The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both. [¶] (b) A governing document other than the declaration may be enforced by the association against an owner of a separate interest or by an owner of a separate interest against the association. [¶] (c) In an action to enforce the governing documents, the prevailing party shall be awarded reasonable attorney's fees and costs."

*The Association's Duty of Care*

 The existence of a duty "is not an immutable fact, but rather an expression of policy considerations leading to the legal conclusion that a plaintiff is entitled to a defendant's protection." (*Ludwig v. City of San Diego* (1998) 65 Cal.App.4th 1105, 1110 [76 Cal.Rptr.2d 809].) Courts have repeatedly declared the existence of a duty by landowners to maintain property in their possession and control in a reasonably safe condition. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561]; *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269 [12 Cal.Rptr.3d 846].) The duty is described as follows: "a landlord must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of such injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect . . . ." (*Brennan v. Cockrell Investments, Inc.* (1973) 35 Cal.App.3d 796, 800–801 [111 Cal.Rptr. 122]; see *Golden v. Conway* (1976) 55 Cal.App.3d 948, 955 [128 Cal.Rptr. 69].)

In addition to this potential basis for liability, a homeowners association is also potentially liable for any violation of statute, administrative code regulation, or building code provision relating to the condition of the property. In such situations, failure to comply with the statutory standard may give rise to a presumption of negligence on the association's part. (*Gallup v. Sparks-Mundo Engineering Co.* (1954) 43 Cal.2d 1, 9 [271 P.2d 34]; *Tossman v. Newman* (1951) 37 Cal.2d 522, 525 [233 P.2d 1]; *Williams v. Lambert* (1962) 201 Cal.App.2d 115, 119 [19 Cal.Rptr. 728]; *Alarid v. Vanier* (1958) 50 Cal.2d 617, 621 [327 P.2d 897].) Such presumption of negligence may arise whether the law violated is a state statute, a safety order, an administrative regulation, or a local building code provision.[14]

 Traditional tort principles impose on landlords, including homeowners associations, that function as landlords in maintaining the common areas of a large condominium complex, a duty to exercise due care for the residents' safety in those areas under their control. (See, e.g., *Kwaitkowski v. Superior Trading Co.* (1981) 123 Cal.App.3d 324, 328 [176 Cal.Rptr. 494]; *O'Hara v. Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 802–803

---

[14] (Safety orders and administrative regulations: *Wiese v. Rainville* (1959) 173 Cal.App.2d 496, 510 [343 P.2d 643]; *Longway v. McCall* (1960) 181 Cal.App.2d 723, 727 [5 Cal.Rptr. 818]; *Hyde v. Russell & Russell, Inc.* (1959) 176 Cal.App.2d 578, 583 [1 Cal.Rptr. 631]; *Di Muro v. Masterson Trusafe Steel Scaffold Co.* (1961) 193 Cal.App.2d 784, 791 [14 Cal.Rptr. 551]; city and county building codes: *Finnegan v. Royal Realty Co.* (1950) 35 Cal.2d 409, 416 [218 P.2d 17]; *Merion v. Schnitzlein* (1933) 129 Cal.App. 721, 723 [19 P.2d 244]; *Block v. Snyder* (1951) 105 Cal.App.2d 783, 786–789 [234 P.2d 52].)

[142 Cal.Rptr. 487]; *Kline v. 1500 Massachusetts Avenue Apartment Corp.* (D.C.Cir. 1970) 141 U.S. App.D.C. 370 [439 F.2d 477, 480–481]; *Scott v. Watson* (1976) 278 Md. 160 [359 A.2d 548, 552]; *Sevigny v. Dibble Hollow Condominium Assn., Inc.* (2003) 76 Conn.App. 306 [819 A.2d 844].) California cases hold that a homeowners association is liable to a member who suffers injury or damages as a result of alleged negligence of the association in failing to maintain a common area adequately. In the leading case of *White v. Cox* (1971) 17 Cal.App.3d 824 [95 Cal.Rptr. 259], the Court of Appeal held that a condominium owner could sue the unincorporated association for negligently maintaining a sprinkler in a common area of the complex. In so holding, the court recognized that the plaintiff, a member of the unincorporated association, had no "effective control over the operation of the common areas . . . for in fact he had no more control over operations than he would have had as a stockholder in a corporation which owned and operated the project." (*Id.* at p. 830.) Since the condominium association was a management body over which the individual owner had no effective control, the court held that the association could be sued for negligence by an individual member. An assessment of the individual arrangements for each condominium association would be required in order to asses the issue of liability. The Supreme Court concluded "that a condominium possesses sufficient aspects of an unincorporated association to make it liable in tort to its members." (*Ibid.*) The *White* case was reaffirmed and cited with approval by the Supreme Court in *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573].

■ There may be other possible theories for liability in addition to the association's negligence. One possibility is the association's fraudulent mis-representation with regard to the safety of its common areas. Another possibility is breach of contract when the plaintiff was a member of the association and the association failed to comply with maintenance of safety provisions in the development's declaration or bylaws. (See, e.g., *Murphy v. Yacht Cove Homeowners Assoc.* (1986) 289 S.C. 367 [345 S.E.2d 709].)

*The Individual Director's Duty of Care*

■ A corporate officer or director, like any other person, owes a duty to refrain from injuring others. (*Frances T. v. Village Green Owners Assn., supra,* 42 Cal.3d at p. 505; *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1381 [93 Cal.Rptr.2d 663].) Consequently, directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct. (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d

770]; *Dwyer v. Lanan & Snow Lbr. Co.* (1956) 141 Cal.App.2d 838, 841 [297 P.2d 490].) ■ However, California has adopted the rule that while a condominium association may be liable for its negligence, a greater degree of fault is necessary to hold unpaid individual condominium board members liable for their actions on behalf of condominium associations.

*The* Lamden *"Judicial Deference" Rule*[15]

The California Supreme Court has adopted a "judicial deference rule" toward the decisionmaking of directors which is expressed in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn., supra*, 21 Cal.4th 249 (*Lamden*), one of the leading cases in this area. In *Lamden*, the plaintiff was a nonresident owner of a residential unit in a condominium project that suffered from termite infestation. After extensive investigation, including consultations with contractors and pest control experts, the association's board of directors decided to respond to the termite problem with spot treatment of known infested areas, rather than tenting and fumigating the buildings, which would have required the temporary relocation of all residents. The plaintiff challenged the board's decision, claiming that the termite eradication program adopted by the board diminished the value of her unit by failing to adequately repair the damage. The trial court determined that the directors of the defendant association had acted on reasonable investigation, in good faith, and in a manner the board believed to be in the best interests of the association and its members as a whole.

The Court of Appeal reversed and ruled that managerial decisions of an association board were subject to judicial review to determine whether the board had satisfied an objective duty of reasonable care in repairing and maintaining the development's common areas. The association appealed to the Supreme Court, arguing that the trial courts should be entitled to intervene only in matters involving the exercise of discretion by governing

---

[15] The legislative comments indicate that Corporations Code section 7231, the standard of fiduciary responsibility for nonprofit directors, incorporates the standard of care defined in Corporations Code section 309. (See Legis. Com. com., Deering's Ann. Corp. Code (1994 ed.) foll. § 7231, p. 245.) Corporations Code section 309 "defines the standard for determining the personal liability of a director for breach of his fiduciary duty to a profit corporation." (*Frances T. v. Village Green Owners Assn., supra*, 42 Cal.3d at p. 506.)

Corporations Code sections 7231 and 309 provide, in relevant part: "A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (Corp. Code, §§ 309, subd. (a), 7231, subd. (a).) In addition, a director is entitled to rely on information, opinions and reports provided by the persons specified in the statute. (Corp. Code, § 7231, subd. (b); § 309, subd. (b).)

boards when it can be demonstrated that the board has acted irrationally, in bad faith, or in an otherwise arbitrary or capricious manner.

■ However, the Supreme Court adopted a rule it termed as analogous to the business judgment rule: "where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." (*Lamden, supra,* 21 Cal.4th at p. 265.) The Supreme Court adopted the association's position, at least as far as ordinary managerial decisions are concerned: "Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments." (*Id.* at pp. 270–271.)

The *Lamden* decision was restricted to "ordinary" decisions involving repair and maintenance actions that were clearly "within the board's discretion under the development's governing instruments. The case gives no direction as to what standards courts should apply when faced with a challenge to a board action involving an extraordinary situation (e.g., major damage from an earthquake) or one not pertaining to repair and maintenance actions, e.g., a decision to deny approval to an improvement project desired by an owner." (Sproul & Rosenberry, Advising Cal. Condominium and Homeowners Associations (Cont.Ed.Bar May 2002 Update) § 2.16, p. 23.) The *Lamden* court also noted that the rule of judicial deference to board decisionmaking can be limited in certain circumstances (e.g., by the association's governing documents, when the association has failed to enforce the provisions of the CC&R's). (See also *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361 [33 Cal.Rptr.2d 63, 878 P.2d 1275]; *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965 [97 Cal.Rptr.2d 280]; *DeBaun v. First Western Bank & Trust Co.* (1975) 46 Cal.App.3d 686 [120 Cal.Rptr. 354].)

*California Statutory Business Judgment Rule*

■ California also has a statutory business judgment rule. Corporations Code section 7231, subdivision (a) provides, in relevant part, "[a] director shall perform the duties of a director . . . in good faith, in a manner such director believes to be in the best interests of the corporation and with such care . . . as an ordinarily prudent person in a like position would use under

similar circumstances." Subdivision (b) of section 7231 provides that the director is entitled to rely on information, opinions, and reports presented by certain specified persons. Finally, subdivision (c) of section 7231 provides, in relevant part, "[a] person who performs the duties of a director in accordance with subdivisions (a) and (b) *shall have no liability based upon any alleged failure to discharge the person's obligations as a director . . . .*" (Italics added.) The rule provides further: "no cause of action for damages shall arise against . . . any volunteer director . . . based upon any alleged failure to discharge the person's duties as a director" of a nonprofit organization if that person (1) performs the duties of office in good faith; (2) performs the duties of office in a manner believed to be in the best interests of the corporation; and (3) performs the duties of office with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. (Corp. Code, § 7231.5, subd. (a).) The business judgment rule "sets up a presumption that directors' decisions are based on sound business judgment. This presumption can be rebutted only by a factual showing of fraud, bad faith or gross overreaching." (*Eldridge v. Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 776 [230 Cal.Rptr. 815].) The business judgment rules does not create a presumption which applies when a court is evaluating the independence of the committee or whether the committee acted in good faith in the first instance. (*Will v. Engebretson & Co.* (1989) 213 Cal.App.3d 1033, 1043 [261 Cal.Rptr. 868], citing *Rosenthal v. Rosenthal* (Me. 1988) 543 A.2d 348, 353.)

*Application of Principles to Current Dispute*

In this case, appellants' contentions regarding liability arise principally from the fact that the jury in its responses to the special interrogatories found no liability on the part of the individual directors. However, as described above, the same jury also found The Churchill entity to be liable. Because of this alleged discrepancy, appellants posit, the jury's special findings are inconsistent and irreconcilable with the general verdict and as a result the trial court should have harmonized these results by directing a verdict for The Churchill. We disagree. Appellants' initial proposition reflects a fundamental misunderstanding of the general principles presented above.

We find no inconsistency between the special findings and the verdict. The liability of The Churchill is separate and distinct from the personal liability of the directors. It is legally possible to have one without the other. First, the association as an entity can be separately liable for its actions. As a separate entity, an unincorporated association owes a duty of care to its members as long as the membership itself is not responsible for the existence of the dangerous condition. Therefore, a member of the association can recover damages from the association which result from a dangerous

condition negligently maintained by the association in the common area. The fact that the actual management decisions are made and carried out by the board of directors does not alter this fact. In the same manner, the association may also be liable for property damages caused by its negligent maintenance of the common area. Further, under well-accepted principles of condominium law, a homeowner can sue the association for damages and for an injunction to compel the association to enforce the provisions of the declaration and can sue directly to enforce the declaration.

Appellants contend that the trial court was required to defer to the Board's good faith decision "whether to undertake building improvement projects." We are unable to locate any authority to support this broad assertion and regard it as a suggested, but unwarranted expansion of appellants' reliance on the "judicial deference" theory—designed to protect board directors from personal liability for their decisions, made in good faith, but ultimately incorrect.

In a related contention, appellants assert that the trial court's "injunctive order is manifestly erroneous and unsupported by any findings of wrongdoing." This assertion compounds the misunderstanding reflected above. This argument is that the trial court, as finder of fact in the court trial on the injunction and declaratory relief counts, is somehow bound by the special findings of the jury as to the personal liability of the Board of The Churchill on the legal causes of action. This does not follow. Our inquiry on appeal regarding the injunctive relief is whether there was substantial evidence to support the implied findings made by the trial judge in his ruling on those issues. The evidence from the record is: the slab penetrations constitute a deviation from the original architectural plans for the construction of the building; the penetrations exist in violation of current building requirements; and the presence of these slab penetrations constitutes a fire hazard—particularly in a high rise structure such as The Churchill. This provided substantial evidence for the trial court to consider and injunctive relief was appropriate. The fact that the directors were named individually in the judgment on the injunctive relief is not a reflection of their individual liability on the negligence or other counts; rather, it reflects the simple reality that an entity acts through its board and/or agents and in order to secure compliance with the judgment, those individuals are properly included within its scope and directions.

We do not agree with appellants' assertion that the trial court's actions interfere with the rights, duties and discretion of The Churchill Board. The trial court is simply performing its obligation to resolve legal disputes between parties with legitimate grievances over which the court has jurisdiction. If appellants' position were correct, cases of this variety would end in

every instance prior to trial, because the court would be constrained from acting whenever the evidence indicated that the dispute arose in the context of a disagreement over the board's proper fulfillment of its responsibilities. We also find the trial court did not misunderstand the situation and, as described above, did not submit conflicting legal theories to the jury or fail to properly instruct them on the rights and duties of The Churchill and its directors.

 The rule of judicial deference set forth in the *Lamden* case provides protection from personal liability for the individual directors of a nonprofit homeowners association. It does not follow and is not true that the same rule of judicial deference will also automatically provide cover to the entity itself. There is a difference between the standard of care, which is a reflection of the duty expected of decision makers, and the judicial deference rule, which is a modified standard of review for determining whether the actual decisions makers will be held liable for their poor decisions. Standards of care continue to have value in remedial contexts, such as injunction and rescission cases, as opposed to actions for monetary damages against directors as individuals. Consequently, we also hold that the trial court did not err in its instructions to the jury and the jury did not err in its results.

## ATTORNEY FEES[16]

*Prevailing Party Determination*

Ruling on the posttrial attorney fee motions, the trial court found that the Ritters were the "prevailing parties" and awarded them $531,159, including essentially 100 percent of all the attorney fees, expert witness fees and costs of suit incurred by the Ritters throughout the proceedings. It denied and rejected The Churchill's and the directors' request for their approximately $775,000 in defense fees and costs. It denied the individual directors' request for their fees and costs because, even though they had been found not personally liable by the jury, the trial court included them in its limited injunction. In their final contention, appellants argue that the trial court's conclusion that the Ritters were the "prevailing parties" entitled to recover their entire $531,159 in attorney fees and costs was erroneous and must be reversed. Appellants contend that the Ritters were not the prevailing parties because they lost in their effort to force The Churchill to fill all the slab

---

[16] The Churchill CC&R's provide:
"XXII ATTORNEY FEES
"In the event the Association, the Board or any owner(s) shall bring legal action against any owner to enforce the terms, covenants, conditions and/or restrictions of this Declaration, and they shall be the prevailing party in said lawsuit, the court shall award reasonable attorney's fees and court costs."

penetrations throughout the building, which was the main reason the litigation become so intense and The Churchill's main objective in defending it.

The parties here apparently agree that The Churchill CC&R's allowed for attorney fees and costs in disputes brought to "enforce the terms, covenants, conditions and/or restrictions of th[e] Declaration . . . ." A condominium owner who successfully sued a homeowners association for breach of contract for failure to maintain common areas was the prevailing party entitled to recover attorney fees under the attorney fee provision contained in the covenants, conditions and restrictions. (*Arias v. Katella Townhouse Homeowners Assn., Inc.* (2005) 127 Cal.App.4th 847 [26 Cal.Rptr.3d 113].) "[I]n deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' [Citation.] [¶] . . . [¶] . . . We agree that *in determining litigation success*, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' For example, a party who is denied direct relief on a claim may nonetheless be found to be a prevailing party if it is clear that the party has otherwise achieved its main litigation objective. [Citations.]" (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876–877 [39 Cal.Rptr.2d 824, 891 P.2d 804], original italics.)

The trial court's determination of the prevailing party for purposes of awarding attorney fees is an exercise of discretion which should not be disturbed on appeal absent a clear showing of abuse of discretion. (*Jackson v. Homeowners Assn. Monte Vista Estates-East* (2001) 93 Cal.App.4th 773 [113 Cal.Rptr.2d 363], quoting *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139, 1153 [67 Cal.Rptr.2d 543], disapproved of on another point in *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 775, fn. 6 [98 Cal.Rptr.2d 1, 3 P.3d 286].) The trial court in this case made such a discretionary determination. We only disturb such a determination when there is a clear showing of abuse of discretion. (*McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450, 1456 [282 Cal.Rptr. 828].)

Appellants contend the trial court abused its discretion finding the Ritters were the prevailing parties below because appellants "prevailed on the issues of greatest importance in the case." The jury found the failure of The Churchill to fire-stop the slab penetrations in the common areas adjacent to the Ritters' units was a breach of the CC&R's. The failure to take any

remedial action was negligence, a breach of the CC&R's and a breach of fiduciary duty. Therefore, the Ritters prevailed on their legal causes of action and were awarded monetary damages by the jury. Although the monetary damages were not substantial, the win also avoided the cross-complaint's $80,000 plus in accumulated fees the Board attempted to assess against the Ritters for failing to correct the slab penetrations in their units.

The Ritters also prevailed on their equitable counts. There was substantial evidence that the slab penetrations constituted a fire hazard and the Ritters were well within their rights to seek injunctive relief to correct the ongoing nature of The Churchill's violation. The Ritters prevailed on their requested injunctive relief. The Churchill was ordered to bring the issue of the slab penetrations to the attention of the full membership and obtain its vote on the issues of a special assessment to fire-stop all slab penetrations. This result accomplished a main litigation objective. Appellants contend that the Ritters did not accomplish their litigation objective because they lost their effort to force The Churchill to fill all the slab penetrations throughout the building. While correction of the entire structure might have been a litigation "dream," it cannot be considered the main litigation objective. First and foremost, the building codes do not mandate that these defects be remediated immediately. If this were a code requirement, this lawsuit would have never occurred. Absent a code requirement, there is no mechanism to force the modifications to be carried out. The only available remedy was to take this extraordinary maintenance request to the full membership for its consideration. This happened. The fact that the membership did not vote to correct this defect in the building does not mean that the Ritters failed on their main litigation objective.

*The Individual Directors*

Appellants contend that "the Directors prevailed against the Ritters, period" and it was "error for the trial court to deny them their fees and costs which they duly and timely claimed in appropriate post-trial filings . . . ." We disagree with this contention. The jury found The Churchill liable on the negligence, breach of fiduciary duty and breach of the CC&R's causes of action. The Churchill is an entity which can only act through the efforts of its directors and agents. As a result of the "business judgment rule" and Corporations Code section 7231, the directors were shielded from personal liability for the consequences of their decisionmaking, but The Churchill was not. As between the Ritters and the individual directors, the trial court did not abuse its discretion finding that the directors were not the prevailing parties. The Ritters prevailed below, the directors merely avoided liability.

*Section 998—Postoffer Costs*

 Under Code of Civil Procedure section 998, a defendant whose pretrial offer is greater than the judgment received by the plaintiff is treated for purposes of postoffer costs as if it were the prevailing party. Appellants contend that the trial court erred in awarding costs to the Ritters in this case because four Code of Civil Procedure section 998 offers were made and the trial court did not analyze or address any of the issues or make any findings as required by section 998.[17] The Ritters state they submitted "detailed analyses" to assist the court in assessing the appropriateness of an award of Code of Civil Procedure section 998 costs.

We find no error. "Whether a [Code of Civil Procedure] section 998 offer was reasonable and made in good faith is left to the sound discretion of the trial court." (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134 [84 Cal.Rptr.2d 753].) "In reviewing an award of costs and fees under Code of Civil Procedure section 998, the appellate court will examine the circumstances of the case to determine if the trial court abused its discretion in evaluating the reasonableness of the offer or its refusal." (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 152 [118 Cal.Rptr.2d 569].) " ' ["]The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." [Citations.]' [Citation.] ' "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. . . ." [Citations.]' [Citation.]" (*Nelson v. Anderson, supra,* 72 Cal.App.4th at p. 136; see also *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].)

*Allocation of Fee Award*

In appellants' reply brief, they make the statement that "[i]n view of the actual outcome at trial, the trial court's fee award cannot be upheld as it failed to include any effort to distinguish the 'wins' and 'losses' on the Ritters' various claims and to make a reasoned allocation among them. See also *Hilltop [Investment Associates] v. Leon* (1994) 28 Cal.App.4th 462, 466

---

[17] Appellants cite *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125 [125 Cal.Rptr.2d 325] and *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103 [86 Cal.Rptr.2d 614, 979 P.2d 974], as authority for the proposition that the trial court was required to make certain findings prior to awarding Code of Civil Procedure section 998 fees. We are unable to locate in the express language of these cases, or any inferences to be drawn therefrom, any requirement for a detailed analysis on the record.

[33 Cal.Rptr.2d 552] . . . ." The fact that a trial judge deciding attorney fees may appropriately "allocate" or "apportion" fees is well known. The issue of allocation of fees was not raised in appellants' opening brief. To the extent that this statement is an effort to interject the failure to allocate as an additional reason to object to the award of attorney fees, we decline to reach the point. We do not consider matters raised by appellants for the first time in their reply briefs. Because appellants did not address this factor in their opening brief, they have waived the right to assert this issue on appeal. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [27 Cal.Rptr.3d 648, 110 P.3d 903]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364].)

## DISPOSITION

The judgment of the trial court is affirmed.

Flier, J., concurred.

**RUBIN, J.,** Concurring and Dissenting.—I concur in the portions of the majority's decision affirming both the liability of The Churchill and the order for injunctive relief, but I dissent from those portions of the decision (1) denying The Churchill directors their reasonable attorney's fees; and (2) awarding the Ritters virtually the full amount of their requested attorney's fees.

### 1. *The Directors Were the Prevailing Parties*

As the directors of a nonprofit mutual benefit corporation, the five Churchill directors had no liability to the Ritters if they acted in good faith in what they reasonably believed were the best interests of the corporation. (Corp. Code, § 7231, subds. (a)–(c) (section 7231); *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1157 [96 Cal.Rptr.2d 128].) The jury in this case apparently made such a finding by exonerating The Churchill directors from liability on each cause of action. The majority believes a fee award was proper against these individuals because The Churchill could act through only its directors, and the directors "merely avoided liability" by virtue of section 7231. Implicit in this is the notion that section 7231 is a mere technicality that allows corporate directors to avoid personal liability for their wrongful acts. I disagree.[1]

---

[1] Attorney's fees have been awarded to parties whose litigation victories were far more "technical" than what transpired here. For example in *Elms v. Builders Disbursements, Inc.* (1991) 232 Cal.App.3d 671, 673, 675 [283 Cal.Rptr. 515], the trial court dismissed a breach of contract complaint for failure to prosecute but denied the successful defendant its attorney's

Section 7231 establishes a statutory standard of care for the directors of nonprofit mutual benefit corporations. (See *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 258 [87 Cal.Rptr.2d 237, 980 P.2d 940]; *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 506, fn. 13, 513–514 [229 Cal.Rptr. 456, 723 P.2d 573].) The standard of care is an essential element of any plaintiff's cause of action. (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 703 [106 Cal.Rptr. 1, 505 P.2d 193]; accord, *Stonegate Homeowners Assn. v. Staben* (2006) 144 Cal.App.4th 740, 748–749 [50 Cal.Rptr.3d 709] [excluding plaintiff's evidence on standard of care was error because such evidence would have allowed plaintiff to overcome nonsuit motion].) In short, if the directors did not violate the applicable standard of care, they did not commit a wrongful act. Because The Churchill directors were found not liable on every cause of action, they were the prevailing parties. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876–877 [39 Cal.Rptr.2d 824, 891 P.2d 804] [where party obtains a simple, unqualified victory on contract claims, it is prevailing party as matter of law].) A plaintiff who sues individual members of a governing board when its claim is legally against only the board itself should not be rewarded by denying the successful members the attorney's fees to which they are otherwise entitled.

The only other possible basis for denying The Churchill directors their attorney's fees is the injunction that ordered them and The Churchill to hold an informational meeting for the homeowners and then have the owners vote whether to have The Churchill pay to repair the slab penetrations in each unit. Although an injunction against the directors might have been proper, because an injunction against a corporation is sufficient by itself to bind the directors (*Signal Oil & Gas Co. v. Ashland Oil & Refining Co.* (1958) 49 Cal.2d 764, 779–780 [322 P.2d 1]), it was unnecessary. As the majority itself notes when concluding that injunctive relief was proper despite the jury's exoneration of the directors, "[t]he fact that the directors were named individually in the judgment on the injunctive relief is not a reflection of their individual liability on the negligence or other counts; rather, it reflects the simple reality that an entity acts through its board and/or agents . . . ." (Maj. opn., *ante*, at p. 124.) To hold that innocent corporate directors are liable for attorney's fees (or are to be denied otherwise authorized attorney's fees) whenever they and their corporate entity are both enjoined to remedy some corporate breach of contract undermines both the spirit and the intent of section 7231.

---

fees. The Court of Appeal reversed the attorney's fees denial, concluding the defendant was the prevailing party. (See also *M & R Properties v. Thompson* (1992) 11 Cal.App.4th 899, 901 [14 Cal.Rptr.2d 579].)

Therefore, I would reverse the order denying The Churchill directors their attorney's fees and remand the matter to the trial court with directions to determine the directors' reasonable attorney's fees for establishing their section 7231 defense.

### 2. *The Fee Award Against The Churchill Should Be Reversed*

The Ritters asked for much at trial, but obtained little. They sued both The Churchill and the directors, alleging damages of $200,000 for the diminished value of their units while seeking an injunction requiring defendants to spend potentially hundreds of thousands more to repair the slab penetrations in not just their unit but in *every* condominium in the complex. All they got was their own unit repaired at a cost of a few thousand dollars, a vote of the other unit owners refusing to fund the repairs of the other units, and relief from the fines imposed by The Churchill for failing to make their own repairs. All five directors were exonerated of liability while the Ritters were found to be 25 percent at fault for the events leading to this action. Despite this, the Ritters were found to be the prevailing parties and were awarded virtually all of their requested attorney's fees, totaling more than $531,000.[2]

Given these obviously mixed results, I believe the trial court abused its discretion and should have determined there were no prevailing parties on the Ritters' complaint. (See *Deane Gardenhome Assn. v. Denktas* (1993) 13 Cal.App.4th 1394, 1398 [16 Cal.Rptr.2d 816] [determination of no prevailing party typically results when the ostensibly prevailing party receives only part of the relief sought].) Alternatively, I would reverse the fee award because the Ritters' limited victory made an award of the full amount unreasonably high. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095–1096 [95 Cal.Rptr.2d 198, 997 P.2d 511] [lodestar determination of attorney's fees may be reduced for several factors, including the success or failure of the prevailing party's case]; *In re Gorina* (Bankr. C.D.Cal. 2002) 296 B.R. 23, 32–33 [awarding prevailing party full amount unreasonable under California law when losing party defeated six of seven causes of action].) The amount of attorney's fees spent on this matter was appalling. Awarding the full

---

[2] According to the Ritters' appellate brief, they have agreed not to enforce their fee award against the directors. I find the directors' liability for contractual attorney's fees puzzling because, absent allegations that the directors entered a contract with the Ritters on their own behalf or purported to bind themselves personally for breach of the CC&R's (covenants, conditions and restrictions), the directors cannot be held liable for breach of contract. (*Frances T. v. Village Green Owners Assn., supra*, 42 Cal.3d at p. 512, fn. 20.) However, that issue does not appear to have been raised either below or on appeal.

amount of attorney's fees rewards the recklessness of the attorneys' unbridled advocacy. What should have been a manageable dispute to be resolved, perhaps, by a one- or two-day arbitration without significant discovery turned into a brakeless locomotive that crashed and destroyed most, if not all, of the benefits achieved in this unfortunate litigation.